# United States Court of Appeals
## For the First Circuit

No. 04-1520

JACOB M. ORNDORF,

Plaintiff, Appellant,

v.

PAUL REVERE LIFE INSURANCE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Torruella, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lynch, Circuit Judge.

Charles Leonard Mitchell for Appellant.

Joan O. Vorster, with whom Elizabeth L. B. Greene and Mirick,
O'Connell, DeMallie & Lougee, LLP were on brief, for Appellee.

April 15, 2005

**LYNCH**, **Circuit Judge**.  This case requires us to address what is meant by de novo judicial review under ERISA of a denial of benefits when the ERISA plan does not preserve discretion in the plan administrator.  That raises concomitant questions of whether the claimant is entitled to trial in the district court and what, if any, evidence may be admitted that is not in the administrative record before the ERISA administrative decision maker.  Our conclusion is that given the nature of the claimant's challenge here -- that he did in fact establish his eligibility to benefits before the ERISA decision maker -- the claimant was not entitled to trial or to admit desired new evidence outside the administrative record or to discovery.  Having defined the standards, we apply them to the facts, and uphold the denial of benefits.

## I.

Jacob Orndorf worked as a perfusionist, a person who operates a heart-lung machine, for Jersey Shore Cardiac Associates, Inc. ("Jersey Shore") from January 1, 1992 until March 29, 1995. Defendant Paul Revere Life Insurance Company ("Revere") provides group long-term disability insurance coverage to Jersey Shore; this plan is an employee welfare benefit plan as defined by ERISA.

In June 1995, Orndorf started receiving disability benefits for his drug dependency; under the policy, these benefits would last only until June 26, 2000.  In 1998, Orndorf first informed Revere that he claimed a continuation of the disability

payments beyond June of 2000 based on purported back problems. There was considerable exchange of medical information between Orndorf and Revere. Revere determined that Orndorf was not disabled due to pain from his back, neck, ankle or hypertension. On January 10, 2002, Revere issued a final denial of benefits and informed Orndorf that he had exhausted all of his appellate administrative remedies and that Revere would review no further information; the administrative record was closed.

In February of 2002, Orndorf[1] filed suit against Revere[2] in federal district court pursuant to 29 U.S.C. § 1132(a)(1)(B), alleging that Revere unlawfully denied his claim for long-term disability benefits due to physical limitations. Both parties filed motions for summary judgment.

The district court extensively reviewed the evidence in the administrative record, the duties of someone in Orndorf's occupation, Orndorf's first claim (drug dependency) and second claim (back pain) for disability, his treatment for back pain, his capacity to work, Revere's conclusion, and Orndorf's arguments on appeal. The court concluded that Orndorf was not disabled due to

---

[1]In several letters and papers in the administrative record, the appellant's name is spelled "Orndorff." However, the complaint and other papers filed in the district court and the briefs before this court use the spelling "Orndorf," and that is the spelling we use in this opinion.

[2]Unum Provident was originally named as a defendant, but on September 16, 2002, the parties stipulated that Revere was the proper and sole defendant.

back, neck, or ankle pain or hypertension under the terms of the plan;[3] "Orndorf's claim collapsed under the weight of the Record." The court granted summary judgment to Revere on March 17, 2004. Orndorf v. Paul Revere Life Ins. Co., No. 02-30024 (D. Mass. Mar. 17, 2004).

## II.

A. The Policy

The Revere long-term disability policy at issue provides benefits in certain situations, including when an individual is totally disabled from performing the duties of his or her own occupation. Total disability for the purposes of Orndorf's policy means:

> a. that because of injury or sickness the employee cannot perform the important duties of his own occupation; and b. the employee is under the regular care of a doctor; and c. the employee does not work at all.

The policy also defines Revere's obligation to pay benefits to the employee:

> [Revere] pay[s] monthly total disability benefits to an employee if he becomes totally disabled while insured due to injury or sickness. The employee must be under the care of a doctor while totally disabled. . . . During any continuous period of disability immediately following completion of the employee's elimination period, but before the end of his benefit period, [Revere] pay[s] the employee a monthly total disability benefit for each whole month in which he is totally

_____

[3]The hypertension claim has been dropped on appeal.

-4-

disabled from his own occupation. If the employee works other than full-time at his own job, he may qualify for monthly residual disability benefits.

B. Orndorf's First Claim for Disability

In May of 1995, Orndorf submitted his first claim to Revere for disability benefits for a "drug related" sickness, following hospitalization for a drug overdose.

Revere evaluated Orndorf's records to determine whether he was totally disabled due to drug disability under the plan, and on August 24, 1995, Revere informed Orndorf that it had approved his claim under the "Other Limitations" provision of the Policy and that his benefits period would expire on June 26, 2000.[4]

Although Orndorf is no longer receiving payments for this disability, his drug and psychiatric illnesses continue to preclude him from returning to his job as a perfusionist.[5] One might ask

---

[4]The plan contains special limitations for "any disability caused or contributed to by a psychiatric condition, alcoholism or drug abuse," such as Orndorf's disability. First, "an employee will be considered to be disabled [under the policy] only if he is satisfactorily participating in a program of treatment or rehabilitation approved by us." Second, for this kind of disability, benefits are limited: "benefits are payable for up to sixty months whether or not the employee is hospital confined. After sixty months, subject to all other policy provisions, [Revere] pay[s] benefits only if the employee continues to be hospital confined due to the disability."

[5]As the district court found, "it is undisputed that [Orndorf's] drug dependency will be a lifelong condition and will prevent Orndorf from ever returning to his occupation as a perfusionist . . . ." This is consistent with the evidence in the administrative record, including Orndorf's own admission. Orndorf stated, "[A]ddiction is a lifetime illness, this means limiting my

why, if Orndorf is disabled anyway from doing his job as a perfusionist, there is any issue about whether he is also disabled by his back condition. There are two answers. The first is that Revere's statement of reasons as to why it denied benefits is that (1) the benefit period for the drug dependency disability had expired and (2) the information provided did not support eligibility for disability under any other provision of the plan. Revere is limited to the grounds of denial it articulates to the claimant. See Glista v. Unum Life Ins. Co., 378 F.3d 113, 128-29 (1st Cir. 2004). Second, Orndorf cites to a provision in the policy that provides for circumstances where an employee is disabled by more than one injury or sickness:

> If a Disability is caused by more than one Injury or Sickness, or from both, We will pay benefits as if the Disability was caused by one Injury or Sickness. . . . We will pay the larger benefit.

Revere has not disputed the applicability of this provision to Orndorf's case.

---

access to medications for ever [sic]. . . . [I] would love to work again in the [medical] field, but my illness makes this impossible."

On appeal, Orndorf in his brief suggests that perhaps he could return to his work as a perfusionist despite his addiction. Orndorf cites to several websites which he states give examples of and information about health care providers recovering and returning to practice. This information was not before the administrator and was not admitted by the district court. We note but do not consider it.

There is no real dispute that Orndorf was paid the benefits owed for his first disability claim due to drug dependency.[6] The question is whether he was disabled within the meaning of the policy for his alleged back condition, his second claim for disability.

C. Orndorf's Second Claim for Disability

Although Orndorf says his history of back pain dates back to 1976, Orndorf first claimed disability on account of his back pain in June of 1998, when a Revere field representative met with Orndorf at his home on an unannounced visit. During this visit, Orndorf claimed that his chief disabling condition was his back and that therefore the disability payments should continue beyond June of 2000. Soon thereafter, Revere obtained Orndorf's complete Social Security Disability Insurance Appeal decision and his medical records.

In December of 1999, the insurer issued its original decision on this second claim, and Orndorf was told that his benefits were denied:

---

[6]Before the district court, Orndorf argued that Revere's termination of his benefits for his drug related disability was arbitrary and in breach of Revere's fiduciary duty. The district court summarily rejected this argument, noting that "no evidence in the Record indicates that Paul Revere failed to pay Orndorf the full amount of the benefits owed to him as a result of his initial disability claim based on drug dependency." The district court concluded, "there is no merit to Orndorf's claim that Revere's decision to 'terminate' his benefits was arbitrary, capricious, and in breach of a duty of good faith and a fiduciary duty." Orndorf does not raise this issue or dispute this finding on appeal.

In the regular course of administering your claim, we conducted a review of all of your medical records. As a result of this review, it is our opinion that you are not precluded from performing the duties of your job or one similar in nature.

You alleged that you could not work due to chronic low back pain and advised your doctor on June 23, 1998 that your activities were limited and you remained indoors most of the time. However, on June 11, 1998, you reported you had been on a long bike ride. There seems to be some discrepancy between your related history and limitations and your actual level of activities and your performance.

We found no evidence of back problems or hypertensive care during the year 1998. Consequently, it is our opinion that your only disabling condition has been depression and substance abuse. Therefore, your claim has been administered and paid under the Other Limitations provision of the policy.

In October of 2000, on the first review of its denial, the insurer advised Orndorf:

We have received your letter dated October 3, 2000 including a letter from Dr. Gilbert. Your entire claim file was sent to our medical department for review, the review included the following records: medical review from Dr. Bianchi, medical packet from you backdated 8/31/00, letter from Dr. Rund dated 11/1/97, a functional capacity form completed by Dr. Gilbert, CT lumbar spine dated 3/8/00 and x-rays of spine and cervical dated 5/12/00.

At this time it is our opinion that in order to fully evaluate your physical limitations and restrictions we need additional objective information. This information should include reports of your last examination from the reported date of your illness and updated physical examinations.

-8-

On August 23, 2001, the insurer affirmed its denial of benefits on the basis that:

> These records were reviewed by one of our in-house physicians. This physician is Board-Certified in Internal Medicine. We have determined that based on [] Mr. Orndorf's medical records that there was no basis for hypertensive impairment, and no evidence of persistent impairment producing limitations or necessitating restrictions from Mr. Orndorf's maxillary sinusitis and cervical spine complaints.

Thereafter, at Ordnorf's request, the insurer considered additional evidence and on January 10, 2002, reaffirmed its denial in a final review:

> Since additional information was submitted, Mr. Orndorf's file was forwarded to the medical department for review. According to the Board-Certified Physician in Internal Medicine, he concludes the following:
>
> a) Primary psychiatric impairment at the date of disability with persistence demonstrated through much of the claim period without adequate objective documentation of persistence to or beyond the 12/21/99 determination letter
>
> b) No objective basis for hypertensive impairment producing limitations or necessitating restrictions at or below a high-level medium workload
>
> c) Degenerative disc disease of the lumbar spine with intermittent symptomatic exacerbations without evidence of continuous or persistent ongoing impairment through the life of the claim, at or about the 12/21/99 determination letter, or subsequently
>
> d) Post-traumatic ankle pathology without objectively demonstrated standing or

-9-

ambulatory impairment during the course of the claim beyond transiently associated with the 11/99 sprain and specifically without evidence of continued or persistent impairment from the 12/21/99 determination letter up to the 5/3/00 rating examination

e)No objective evidence of continued or persistent impairment producing limitations necessitating restrictions from the claimant's maxillary sinusitis and cervical spine complaints.

Based on the information in the claim file, the denial of benefits in Mr. Orndorf's case is appropriate.

Orndorf then filed suit in the district court.

**III.**

On appeal, Orndorf raises several challenges to the district court's decision, arguing the district court erred by (1) failing to use de novo review in ruling on the cross motions for summary judgment; (2) denying Orndorf's request for discovery and leave to submit additional evidence; (3) denying Orndorf's motion for summary judgment or, in the alternative, in failing to find a material dispute of fact which would have defeated Revere's motion; and (4) not awarding Orndorf interest, attorney's fees, and costs. If Orndorf is wrong about the first three claims, the fourth necessarily fails.

Both parties agree that de novo review by the district court of a plan administrator's decision to deny benefits under an ERISA plan is proper under Firestone v. Bruch, 489 U.S. 101, 115 (1989), where the plan does not grant discretion to the

-10-

administrator.[7]    The overarching question is what exactly is entailed in de novo review.

A.  Appellate Standard of Review

We quickly put aside one issue about the scope of our appellate review.  Because the case was decided on summary judgment in the district court, the standard of review used by this court to review the district court's decision is de novo.  See Fenton v. John Hancock Mut. Life Ins. Co., 400 F.3d 83, 87 (1st Cir. 2005).  This includes our engaging in non-deferential review of the legal question of the proper content of the district court's de novo review of a plan administrator's determination, as that term is used in Firestone v. Bruch, 489 U.S. at 115.

The review utilized both by this court and the district court in this ERISA case differs in one important aspect from the review in an ordinary summary judgment case.  As we noted in Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19 (1st Cir. 2003), in an ERISA case where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue.  Id. at 24.  This means the non-moving party is not entitled to the usual inferences in its

---

[7]Firestone held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone, 489 U.S. at 115.

favor.  Id.  When there is no dispute over plan interpretation, the use of summary judgment in this way is proper regardless of whether our review of the ERISA decision maker's decision is de novo or deferential.[8]

B.  Content of De Novo Standard of Review

Plaintiff's argument as to the proper content of the district court's de novo review is based on the second paragraph of Firestone's holding, set forth below:

> As this case aptly demonstrates, the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue.
> Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

Firestone, 489 U.S. at 115 (emphasis added).

Firestone makes it clear that in such situations of dispute over the meaning of plan language, no deference is given to the administrator's interpretation of the plan language.  Rather,

---

[8]To the extent Radford Trust v. First Unum Life Insurance Company of America, 321 F. Supp. 2d 226, 239 (D. Mass. 2004), suggests otherwise, we disagree.  It cites to Hughes v. Boston Mutual Life Insurance Company, 26 F.3d 264, 268 (1st Cir. 1994), a case concerned with the different issue of application of summary judgment rules to interpretation of ambiguities in an ERISA contract.  Id. at 270.  For a discussion of the interplay of contract and summary judgment rules, see McAdams v. Massachusetts Mutual Life Insurance Company, 391 F.3d 287, 298-300 (1st Cir. 2004).

the court interprets the plan de novo, and applies the normal rules for contract interpretation. See Hughes v. Boston Mut. Life Ins. Co., 26 F.3d 264, 267-68 (1st Cir. 1994). In this case, there is no dispute about interpretation of the plan terms presented on appeal.[9] Thus there is no occasion to consider the use of outside evidence to assist the court in interpreting plan language. There is also no dispute over what the plan documents are. Cf. Fenton, 400 F.3d at 87-89. But literally read, Firestone's de novo review language is broader, and also includes a conclusion to deny benefits based on a set of facts, such as Revere's conclusion here.

From Firestone's de novo review language, Orndorf makes several arguments.

Orndorf argues that the district court erred by giving deference to the administrator's decision. The correct standard, he argues, is "whether, upon a full review of the administrative

_____

[9]Orndorf asserts in his brief that Revere applied the wrong standard of total disability by stating in its first denial of Orndorf's disability claim that "it is our opinion that you are not precluded from performing the duties of your job or one similar in nature." (emphasis added). But Orndorf makes no serious argument that Revere misinterpreted the policy or that Revere ultimately applied this definition of disability as opposed to the one which requires that Orndorf cannot perform the important functions of his own profession. It is clear that this is the definition Revere applied in making its final determination that Orndorf was not entitled to disability. In the September 2000 review by Revere, the reviewer was specifically asked whether the insured was precluded from performing the duties of his own occupation, which was listed as perfusionist. In the August 2001 review, Revere asked what the reviewer's prognosis was for Orndorf's return to work; his occupation was listed as perfusionist.

-13-

record, the decision of the administrator was correct." We agree with this standard and disagree that the district court used any other standard.

Orndorf next argues that if the administrative record shows any conflict in views among the doctors, then summary judgment must be denied. Orndorf may be arguing that on review of an administrative record through summary judgment the court must relieve him of his burden of proving he is disabled because under summary judgment all inferences are drawn against the movant. We have already rejected this argument in Liston, 330 F.3d at 24, and we apply Liston to de novo review, as noted above. Alternatively, Orndorf may be arguing that a court faced with an administrative record with conflicting medical opinions should then hold a trial with witnesses to resolve the disputes. He filed a motion to that effect, which was denied by the district court. The court was correct to deny the motion. Trial is not warranted because the record shows one doctor's diagnosis disagrees with another's, and the fact that judicial review is de novo does not itself entitle a claimant to a trial or to put on new evidence.[10]

---

[10]By analogy, we have held where review (under an arbitrary and capricious standard) is based on an administrative record and no additional evidence is considered, jury trials are not available. See Recupero v. New Eng. Tel. & Tel. Co., 118 F.3d 820, 831 (1st Cir. 1997). Again, the change in standard of review from arbitrary and capricious review under Recupero to de novo review in this case makes no difference.

Some courts have stated that "factual findings" made by the administrative decision maker are reviewed de novo and have suggested that this warrants the introduction of new evidence to the trial court, perhaps in the form of an evidentiary hearing or a trial de novo. See Luby v. Teamsters Health, Welfare, & Pension Trust Funds, 944 F.2d 1176, 1184-85 (3d Cir. 1991). Where review is properly confined to the administrative record before the ERISA plan administrator, as we explain below is the case here, there are no disputed issues of fact for the court to resolve.

Review of the ultimate conclusion of whether the evidence supports the finding of a disability does not itself warrant introduction of new evidence about historical facts. See Masella v. Blue Cross & Blue Shield, Inc., 936 F.2d 98, 104 (2d Cir. 1991). Nor does it warrant calling as witnesses those persons whose opinions and diagnosis or expert testimony and reports are in the administrative record. Rather, de novo review generally consists of the court's independent weighing of the facts and opinions in that record to determine whether the claimant has met his burden of showing he is disabled within the meaning of the policy. While the court does not ignore facts in the record, see Recupero v. New Eng. Tel. & Tel. Co., 118 F.3d 820, 830 (1st Cir. 1997), the court grants no deference to administrators' opinions or conclusions based on these facts.

-15-

One guiding principle in conducting de novo review of this ultimate conclusion is that it is the plaintiff who bears the burden of proving he is disabled. <u>See</u> <u>Terry</u> v. <u>Bayer</u>, 145 F.3d 28, 34 (1st Cir. 1998) (insured bears burden of making showing sufficient to establish a violation of ERISA); <u>GRE Ins. Group</u> v. <u>Met. Boston Hous.</u>, 61 F.3d 79, 81 (1st Cir. 1995).

<u>C.   Extra-Administrative Record Evidence</u>

Orndorf also argues that the trial judge should have admitted evidence outside of the administrative record on the question of whether he was disabled.  He argues the trial court erred:

> in denying [him] leave to submit evidence of significant weight gain of 80 pounds, medical records of his need for gastronomy for weight loss, records of his prescribed pain killers for pain reduction such as oxycodene and clonazepon, a MRI showing disc change and nerve compromise, and a medical report from Dr. Marc Linson, an orthopedic spine specialist, who examined Orndorf and his records and opined that he was disabled on January 10, 2002, the date of Revere's denial and at the time of the examination one year later.

Not only do we reject Orndorf's claim that it was error for the court to exclude such extra-record medical evidence, but we hold it would have been error for the court to have admitted such evidence.

The decision to which judicial review is addressed is the final ERISA administrative decision.  It would offend interests in finality and exhaustion of administrative procedures required by

-16-

ERISA to shift the focus from that decision to a moving target by presenting extra-administrative record evidence going to the substance of the decision.  <u>Liston</u>, 330 F.3d at 24.  There is no claim Orndorf was denied an opportunity to present evidence to the administrator.  Here, the plaintiff had ample time to collect records and had two administrative appeals reviews of his claims by Revere.  Even if the new evidence directly concerned the question of his disability before the final administrative decision, it was inadmissible.

Furthermore, the final administrative decision acts as a temporal cut off point.  The claimant may not come to a court and ask it to consider post-denial medical evidence in an effort to reopen the administrative decision.  The evidence Orndorf sought to introduce is of this character.

As this court noted in <u>Liston</u>, the focus of judicial review, under the arbitrary and capricious standard, is ordinarily on the record made before the administrator and at least some very good reason is needed to overcome that preference. <u>Id.</u> <u>Liston</u> did not resolve the question of whether the same rule applies when there is de novo review, but did note that even in de novo review cases it was:

> at least doubtful that courts should be in any hurry to consider evidence or claims not presented to the plan administrator . . . . Exhaustion of remedies principles point in this direction even if <u>no</u> deference were due to the administrator's determination, assuming

> always that the plan empowered the administrator to make an initial decision.

Id. (citation omitted).

We hold that the Liston rule about admissibility of evidence outside the administrative record applies even when the denial of benefits is subject to de novo review. Whether evidence is admissible turns on the nature of the challenge to the decision; the answer to the question is not likely to turn on whether the standard of judicial review is de novo or arbitrary and capricious. The focus of the review under de novo review is still the administrator's decision and must ordinarily be based on the administrative record.

There may be times when it is appropriate for courts to hear new evidence. Where the challenge is not to the merits of the decision to deny benefits, but to the procedure used to reach the decision, outside evidence may be of relevance. For example, evidence outside the administrative record might be relevant to a claim of personal bias by a plan administrator or of prejudicial procedural irregularity in the ERISA administrative review procedure. See id. at 23. We need not catalogue the situations in which new evidence is admissible, other than to note it is more obviously relevant when the attack is on the process of decision making as being contrary to the statute than on the substance of the administrator's decision. Also, evidence may be relevant to explain a key item, such as the duties of the claimant's position,

-18-

if that was omitted from the administrative record. Such explanatory extrinsic evidence was admitted by the district court in this case; Revere has not disputed this admission.

Other courts have suggested various measures for evaluating the admissibility of such extra-administrative record evidence. See, e.g., Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1023-25 (4th Cir. 1993) (en banc). But we need only note, not decide the issue. The evidence here was inadmissible, inter alia, because the other evidence plaintiff advances is largely evidence collected after or evidence of his condition after Revere's final decision on January 10, 2002.

D. Discovery

Orndorf also argues the district court should have provided him with discovery "to determine whether the Revere claim staff and medical reviewers followed procedure and were properly educated, trained and qualified."

The district court invited Orndorf to make a more specific showing of the pertinence of the request, but he did not. The court was correct to deny discovery. There was no serious claim of bias or procedural misconduct toward Orndorf. As we said in Liston, "at least some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator." Liston, 330 F.3d at 23. This is

true as to discovery as well, regardless of whether the standard of review is de novo or deferential.

**III.**

Turning to review of the record, we summarize the evidence.

A.  The Duties and Job Requirements of a Perfusionist

In 1995, in connection with his first disability claim, Orndorf filed an occupational report with Revere detailing the physical demands of his job.  He noted that he frequently had to stoop and bend; occasionally had to reach above his shoulder level; continuously needed manual dexterity; occasionally had to lift 50 pounds; never had to carry; and had to both sit and stand for 5 hours.  He described his most important or essential function as "operating a heart lung machine during open heart surgery," and he left blank the space for "additional comments on physical requirements."  Revere does not dispute that Orndorf's "own occupation" was that of a perfusionist, and does not dispute his characterization of the physical requirements of his job.

An Employability and Earning Capacity Evaluation[11] which was admitted into evidence by the district court describes the job of a perfusionist:

---

[11]The district court admitted this report only for the limited purpose of clarifying the duties of a perfusionist, and struck other portions of the report.

-20-

Sets up and operates heart-lung machine in hospital to take over functions of patient's heart and lungs during surgery or respiratory failure. Reviews patient medical history and chart, and consults with surgeon or physician to obtain patient information needed to set up heart-lung machine and associated equipment. Selects, assembles, sets up, and tests heart-lung machine to ensure that machine and associated equipment function according to specifications. Operates heart-lung machine to regulate blood circulation and composition, to administer drugs and anesthetic agents, and to control body temperature during surgery or respiratory failure of patient. Monitors and observes operation of heart-lung machine and patient's physiologic variables such as blood temperature, blood composition, and flow rate, and adjusts equipment to maintain normal body functions. Cleans and adjusts parts of heart-lung machine.

The report classifies the perfusionist's job as "medium work" according to the Department of Labor, meaning that it involves exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently. The report notes that the job involves lifting filled blood lines and buckets of ice weighing up to 50 pounds. The other physical demands include stooping, occasionally; crouching, occasionally; reaching, constantly; handling, constantly; fingering, constantly; feeling, occasionally; and talking, frequently.

B. Evidence in the Record of Orndorf's Back, Neck, and Ankle Pain and Treatment:

Orndorf first sought treatment for back pain in 1976. While serving in the Air Force, he sought treatment in September of 1978 at the Andrews Air Force Base Spine Clinic and in July of

-21-

1979, after injuring himself while jumping out of a moving car.  X-rays taken in July of 1979 indicated that he had 50 percent loss of disc space between L4-L5 in his spine.  The next record of treatment for back problems was on October 23, 1992, approximately ten months after Orndorf started as a perfusionist at Jersey Shore.  At this visit, he complained of "recent low back pain" after he weight lifted 350-400 pounds.

In December 1993, Orndorf had an MRI of his lumbar spine.  The radiologist report noted that "[t]here is a central and left sided disc herniation at the L4-L5 level.  There are degenerative disc changes of this disc with a decrease in the disc space height and some loss of signal intensity of the disc."  The impression of the radiologist was "central and left sided disc herniation with prominent degenerative changes at the L4-L5 level.  No evidence of lumbar spinal stenosis."

In January of 1994, Orndorf sought medical attention for low back pain.  The treating physician noted that Orndorf had "[a]dvanced degenerative changes with small disc fragment at 4-5 interval with secondary changes at the 3-4 interval."  He recommended "strong rehabilitative program" and a series of epidural injections.  Orndorf claims to have received a series of three epidurals at Jersey Shore Medical Center, although there are no medical records of these treatments.  On March 8, 1995, Orndorf went to a clinic complaining of chronic low back pain, which he

-22-

claimed was aggravated from standing and walking. He was offered an orthopedic evaluation and a rehabilitation/medical evaluation, both of which he declined; he accepted a prescription for percocet.

From March 29, 1995 to April 3, 1995, Orndorf again complained of back pain during his stay at the Cooley Dickson Hospital Psychiatric Program, where he was hospitalized after a drug overdose. The discharge summary noted that during his hospitalization, Orndorf complained of back pain, but this pain was "found to be controllable with Tylenol and stretching exercises."

There is no evidence that Orndorf was treated for or experienced low back pain after his release from the hospital in April of 1995 to June of 1996.

In June 1996, Orndorf was involved in a slow speed car accident and complained of low back strain. While a Lumbosacral Spine exam showed narrowing of the L4-L5 disc, possibly with associated spinal stenosis or disc herniation, the radiologist thought it "very unlikely" to be related to the car accident.

In September 1996, Orndorf was again treated for back pain, at the Veterans Administration ("VA") Medical Center complaining that he could not stand for more than half an hour. The impressions of the physician seeing Orndorf included "chronic low back pain" and herniated discs between L4 and L5. Orndorf was referred to physical therapy and rehabilitation; the recommended

plan included weight reduction and use of a TEN's unit (a portable physical therapy device) for a period of four weeks.

Orndorf then started a course of physical therapy and pain treatments. During the September 30, 1996 session, he reported that the TEN's Unit worked "great." On October 31, 1996, Orndorf was treated with an epidural block. He reported he obtained 2-3 months relief with past epidural blocks. On November 5, 1996, he again reported good results from the epidural block, and on December 6, 1996, his physician noted that his low back pain was stable.

There is no evidence that he was treated for or experienced low back pain from November 1996 to December 1997, with the exception of a letter from a physician stating that Orndorf was unable to perform a stress test because of low back pain.

On December 4, 1997, Orndorf was treated again for complaints of low back pain. He was to receive an epidural block and have physical therapy for a few weeks. He went for physical therapy on December 5, 8, 11, and 15, 1997, but did not show up for his appointments on December 17, 19, and 22. The treatment plan was terminated on December 22 due to his failure to keep his appointments.

On January 9, 1998, Orndorf saw an orthopedist. On the questionnaire form, he indicated that he had experienced back pain "off and on" since 1976. He noted that he could not stand for a

long time and that the pain was severe.  However, he also indicated that pain medicines, arthritis medicines, physical therapy, heating pads, nerve stimulation, and cortisone injections all "improved" his back pain.  The orthopedist's form indicated that in general, Orndorf appeared healthy, and that epidurals gave him "2 months to a year's relief - pain comes back gradually."  The orthopedist noted the "good results of epidural injections."

On June 23, 1998, Orndorf informed a Revere field representative that his addiction and his bi-polar disorder were well controlled.  He noted that he was aware his benefits for this disability would end, but that his chief disabling condition was his back and that his claim for long term benefits would extend beyond the 60 months.

On July 27, 1998, Orndorf again visited a doctor with complaints of low back pain.  The treatment included continuing physical therapy and referral to a pain clinic for an epidural block.  Orndorf reports that in the summer and fall of 1998, he went to the VA pain clinic for three epidurals.

From August 1998 to June 1999, there is no record of Orndorf being seen by a physician or receiving any treatment for low back pain.  At the end of June 1999, he once again went to a physician with a chief complaint of low back pain.  Dr. Richard Norris noted that the most likely origin of the low back pain was an accident in 1976.  Dr. Norris noted severe narrowing in disc

space and disc herniation. The doctor observed that Orndorf's "gait is minimally antalgic on the left. He has moderate restriction of range of motion of the lumbar spine." Dr. Norris noted that Orndorf had a "severe discogenic disease at L4-5."

Orndorf claims that in November of 1999, his back pain caused him to fall down the stairs and that he was seen at the VA clinic. There are no documents verifying this event.

On January 23, 2000, Orndorf went to the VA clinic after regular office hours with a complaint of back pain exacerbation from standing too long. The physical examination revealed that he had mild tenderness in the mid-lumbar area, no fluctuance, no radiation, and normal gait. The examiner noted no evidence of back muscular spasms. The examiner offered Motrin to the patient, which was refused. The examiner told Orndorf that he could not schedule a CT Scan and informed Orndorf that due to the chronic nature of this problem, he should contact his primary care physician the next morning, who might better be able to serve him. The examiner noted that Orndorf was upset when he could not receive narcotics after hours.

Orndorf did schedule a CT Scan with the VA Medical Center, which was performed on March 8, 2000. The radiologist's impressions from the scan were "[m]oderate degenerative disc disease [at] L4-5 causing mild central spinal stenosis."

-26-

In contrast to the extensive medical records of Orndorf's treatment for back problems, the record contains little evidence of Orndorf's neck or ankle problems. Orndorf broke his ankle in 1974 while serving in the Air Force. In 1999, he sprained the same ankle, but was physically impaired only briefly. A CT scan report of Ordnorf's ankle dated May 4, 2000 notes, "marked narrowing of the talotibial joint . . . degenerative changes with spurring and sclerosis involving the distal tibia[,] . . . the medial and lateral malleolus . . . and plantar clacaneal spurring."

As for his neck pain, Orndorf suffered a cervical fracture in 1978, and a cervical strain associated with an automobile accident in June 1996. A report of an X-ray taken on Orndorf's neck on May 12, 2000 states "cervical spondylosis at the C5-C6 level with mild encroachment of the intervertebral formina [and] loss of normal cerival curvature compatible with muscle spasm."

There is no additional evidence for treatment of back, neck, or ankle problems.

C. Evidence in the Record of Orndorf's Physical Limitations and Capacity to Work

In May of 1995, when Orndorf submitted his first claim for disability, he did not report back pain or any other physical limitation that affected his ability to perform his job as a perfusionist. He noted that his only sickness was "drug related," and in response to the question of how the "disability [has]

interfered with the performance of the job? . . . Please describe sitting, standing and walking requirements and limitations," Orndorf wrote only, "judgment." The physician who completed the Attending Physician's Statement ("APS") for the first claim also did not identify any physical limitations on Orndorf's capacity to work.

In his evaluation for vocational rehabilitation on June 26, 1995, Orndorf reported that he had no physical disabilities, but did suffer from hypertension. Also, in December of 1995, Orndorf told a Revere claims department agent that he was interested in working and that he would do laborer work, but not forever. On March 12, 1998, Orndorf was "think[ing] about" returning to work as a perfusionist, and in an April 1998 psychotherapy session he was "struggling with work issues . . . as he starts to cope with the idea of his insurance getting cut off eventually."

Orndorf's psychotherapy notes of June 11, 1998 reference his recent long bicycle ride and sweat lodge ceremony and note that he was engaging in physical activities. On June 23, 1998, a Revere field representative observed that Orndorf had a bike or ski rack on the top of his car and lived in a second floor walk up apartment; however, the only outdoor activity that Mr. Orndorf admitted to was taking short walks. Orndorf's psychotherapy notes on July 2, 1998 indicate that he had been on "some bicycle trips."

-28-

On September 22, 1998, a Social Security Administrative Law Judge ("ALJ") found that Orndorf was "entitled to a Period of Disability commencing March 28, 1995, and to Disability Insurance Benefits under Section 216(i) and 223, respectively, of the Social Security Act." The ALJ relied on the findings of the April 1996 and November 1997 physical examinations of Orndorf by Dr. Tonelli, a Disability Determination Services staff physician. Dr. Tonelli found that Orndorf's low back pain was severe. He assessed that Orndorf retained the ability to lift and carry up to 10 pounds frequently and 20 pounds occasionally; sit, stand, and walk without restriction; and perform unlimited pushing and pulling. Dr. Tonelli believed that Orndorf could perform occasional climbing, balancing, stooping, kneeling, crouching, and crawling. Another Disability Determination Services staff physician, Dr. Oscar Cartaya, concurred with the opinion of Dr. Tonelli except he found the claimant could perform frequent balancing, kneeling, crouching, and crawling.

The ALJ determined that due to a combination of back impairment, hypertension, cardiac impairment, bipolar disorder, and a mixed personality disorder, Orndorf had impairments which made it impossible for him to return to his former employment or make an adjustment to other work, as of March of 1995.

The ALJ found that "as a result of his mental impairments, [Orndorf] would be markedly limited in his ability to

complete a normal workday and workweek without interruptions from psychologically based symptoms and moderately limited in his ability to maintain attention and concentration for extended periods and to perform at a consistent pace without an unreasonable number and length of rest periods." She also found physical limitations consistent with Dr. Tonelli's analysis. The ALJ noted that Orndorf's drug addiction was "not a contributing factor material to the determination of disability."

Orndorf's APS of August 1998, which was signed by Dr. Hashimi, Orndorf's psychiatrist, states that Orndorf is totally disabled from his job and has been totally disabled from July 13, 1979 to the present. The diagnosis listed is bipolar disorder. On November 18, 1998 Revere received the last APS regarding Orndorf, also from Dr. Hashimi. The space for diagnosis was left blank. Orndorf's November 24, 1998 psychotherapy note indicates that one of his hobbies was exercising.

In June 1999, Orndorf reported to Dr. Norris that he rides a bicycle one to two times a week for two to three hours, and that during the past several years he had received six to seven epidurals with varied results. These would bring him relief up to three to four months.

On October 3, 2000, Orndorf submitted to Revere a letter from Dr. Mark Gilbert dated September 12, 2000. The letter was addressed "To Whom It May Concern" and read as follows:

-30-

> Jacob Orndorf is a 45 year-old man disabled because of back pain. He first injured his back in 1976. Since then, he has seen a variety of specialists and has had a variety of treatments for progressive incapacitating back pain. At this time, he says that he cannot stand more than a few minutes, cannot sit for over half an hour, and has to lie down several times during the day because of pain. MRI done in 1993 shows central and left-sided disc herniation with prominent degenerative changes at the L4-L5 level. He currently is 40% service-connected for back pain and says that he is receiving Social Security disability. Because of this, I consider him disabled for sustained work.

Orndorf also submitted a functional capacity form filled out by Dr. Gilbert. It is not clear whether Dr. Gilbert completed the form from a physical examination or only from Orndorf's verbal answers to the questions. Although the form is not dated, Orndorf claims it is from September of 2000. It states that in an eight hour day, Orndorf can sit for one hour at a time and stand or walk for one-quarter of an hour at a time. It indicates that Orndorf can occasionally lift or carry up to 20 pounds but can never lift or carry over 20 pounds. The form says that Orndorf can never squat, crawl, or climb.

On November 21, 2000, Orndorf was determined disabled from any employment by the Department of Veterans' Affairs as a result of on ankle fracture and hypertension effective October 22, 1997. The report found that his ankle was 20% disabling -- the highest evaluation assigned for limitations of motion for an ankle -- and that he had limited motion of the ankle.

-31-

**IV.**

In light of this evidence and the burden being on the claimant to establish disability, we consider Orndorf's primary arguments that the decision to deny benefits was wrong.

First, Orndorf argues that the reasons relied on by Revere are simply untrue, including the statement that Orndorf's lumbar disc disease was "with intermittent symptomatic exacerbation without evidence of continuous or persistent ongoing or persistent impairment through the life of the claim, at or about the 12/21/99 determination letter or subsequently" and the statement that "we found no evidence of back problems . . . during the year 1998."

Second, he argues Revere's reasons for denying his claim are without support in the record and fail to take into account certain evidence about the duration and constancy of his back pain. Specifically, he argues Revere did not credit the disability determination of the Social Security Administration, the Veteran's Administration, or Orndorf's physician, and that Revere did not perform its own medical examination.[12]

---

[12]Orndorf makes a variety of other arguments concerning Revere's decision that Orndorf was not disabled. First, he argues that while administrators are not required to credit a treating physician's assessment, Revere must offer a reason why it did not credit his statement including either collusion by treating physician or a reasonable basis for rejecting his opinion. He argues that Revere did not refer back to the duties of the perfusionist, or specifically make any determinations as to whether Orndorf could perform the duties of perfusionist, his own occupation. These types of arguments are relevant when performing arbitrary and capricious review to determine whether the decision

We do not read the denial of benefits to have ignored significant material evidence submitted by Orndorf. The denial letter need not detail every bit of information in the record; it must have enough information to render the decision to deny benefits susceptible to judicial review. When the standard of judicial review is de novo, then the administrator, of course, runs a greater risk of reversal if there is little discussion of the evidence about disability. The discussion here of the reasons to deny benefits, as recounted above, was considerable. The opinion of the claimant's treating physician, which was considered, is not entitled to special deference. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003).

Orndorf's claim that Revere did not have its own physician examine Orndorf, as opposed to reviewing records, does not establish his case. Denials of benefits may be based on review of medical records submitted by the claimant. Orndorf's claim was thoroughly reviewed by a board certified internal medicine physician. And this is simply not a case where the only medical evidence ran in Orndorf's favor, thus casting into doubt a denial of benefits.

---

was reasonable. On de novo review, we reach our own decision based on the administrative record; Orndorf's obligation at this point is to carry his burden to establish that he is disabled under the plan.

To the contrary, the evidence runs against Orndorf's claim of physical disability. This case turns not on the question whether plaintiff suffered back, ankle, or neck pain. The evidence is that he did suffer at least back pain. The medical reports clearly show back problems and the patient's reports of back pain over time. This case turns on whether he met his burden of showing that this back pain disabled him from performing his job as a perfusionist. These records do not establish that these problems disabled Orndorf from performing the duties of a perfusionist. On de novo review, we conclude that Orndorf did not meet his burden. Indeed, from the evidence, several dominant themes emerge.

First, Orndorf actually worked as a perfusionist without any physical limitations despite twenty years of back pain and treatment. Even as late as January 1994, Ordnorf complained to a doctor of "long-standing" low back pain, yet he continued to perform his job for another 14 months without any physical limitations or claims of disability.

Second, when Orndorf stopped working in 1995, it was not because of back pain, but because of his drug dependency. Indeed he did not at this time attribute his disability to back pain. Orndorf himself noted on the claims form that he filled out for his first claim of disability that he had no physical limitations and his only disability was drug dependency.

Third, even after he stopped working in 1995, this back pain was controllable and it did not prevent him from working. During his stay at the Cooley Dickson Hospital in 1995, the doctor noted that Orndorf complained of back pain, but that the pain was controllable with a common pain reliever and stretching exercises. In Orndorf's vocational rehabilitation evaluation, he reported no physical disabilities, and in December of 1995, Orndorf told a Revere representative that he would perform laborer work. In March of 1998, Orndorf became concerned about his ability to survive on disability, and he was considering returning to work as a perfusionist. Indeed, he reported in 1996 and 1997 that various pain therapies for his back were working.

Fourth, Orndorf engaged in recreational and life activity inconsistent with his claim of disability. The notes of Orndorf's psychotherapist suggest that Orndorf was taking bicycle rides and engaging in physical activity. In 1998, he lived on the second floor and had a bicycle rack on his car.

Fifth, even the 1998 Social Security Administration determination of disability did not establish disability from his job as a perfusionist due to his back problems. Rather, the disability finding was based on a combination of factors including hypertension, cardiac impairment, bipolar disorder, and mixed personality disorder. The same is true of the Veteran's Administration report.

Sixth, the back disability claim was not made at all until Orndorf had only two years of disability payments remaining from his drug dependency claim. Orndorf's claim for back disability followed his expressed concerns with work issues "as he start[ed] to cope with the idea of his insurance getting cut off eventually."

In light of this, the most reasonable view of the evidence is that Orndorf does not meet the definition of disability by a physical condition.

The award of judgment to the defendant is **affirmed**. No costs are awarded.